FILED
**United States Court of Appeals**
**Tenth Circuit**

**August 30, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

HOLLY LOUIS, an individual,

     Plaintiff - Appellee,

v.

MERCY HEALTH, a foreign corporation,

     Defendant - Appellant.

No. 15-6235
(D.C. No. 5:14-CV-01358-C)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MURPHY**, and **PHILLIPS**, Circuit Judges.
_____

Defendant Mercy Health, which operates the Mercy Hospital in Oklahoma City,

appeals a jury verdict against it for not providing proper medical attention to Plaintiff

Holly Louis when she miscarried in the hospital's emergency room. After the close of

evidence, Mercy moved for judgment as a matter of law on two grounds: (1) that a

pretrial stipulation barred relief because Louis admitted to suffering no physical injuries,

as required by Oklahoma law; and (2) that Louis failed to produce sufficient evidence of

injuries caused by the hospital's negligence, rather than by the miscarriage itself. In

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

particular, Mercy argued that expert testimony was required on this causation issue. The district court denied the motion and we affirm.

## I. BACKGROUND

We begin with a brief summary of Louis's testimony at trial. On July 7, 2014, she went to Mercy Hospital experiencing sharp abdominal pain. At the time, Louis was about 17 weeks pregnant. She was seen by a healthcare professional, diagnosed with a urinary-tract infection, and sent home with antibiotics. Unfortunately, her pain increased and she began bleeding and feeling nauseated. Her mother returned her to Mercy's emergency room, where she was seen by a doctor after waiting about an hour in the waiting room. She received a pelvic examination and an ultrasound and was informed that her baby was healthy.

But then Louis's water broke. She informed the nurse what had just happened, but the nurse told Louis that she likely had just urinated. Louis disagreed and asked for a test strip to determine whether it was amniotic fluid. The nurse said that she did not have obstetrics experience and Louis would have to wait for the doctor, who was currently tending another patient. Soon thereafter, Louis stood up and saw several blood clots fall to the floor. The nurse was standing in the doorway, but did nothing.

As she waited for the doctor to return, Louis felt greater pain and pressure. When Louis's mother checked her to make sure everything was all right, she saw the fetus's head. Her mother ran into the hallway toward the nursing station and said that Louis was having the baby. Louis gave birth without any healthcare provider present. At some

point the nurse came into Louis's room, but she did not provide any information or any comfort or support.

After the miscarriage Louis remained on her bed with the fetus between her legs. She requested that the umbilical cord be cut. But when the doctor came in, he told her that he preferred not to cut the umbilical cord and instead wanted to provide her medicine to help her pass the placenta. Soon thereafter she again requested to the nurse that the umbilical cord be cut. Finally, after about one hour and 45 minutes with the fetus between her legs, the umbilical cord was cut and the fetus was removed.

No one in the hospital provided Louis a bereavement box until her mother inquired about one. And although the hospital typically provides the family with the handprints and footprints when a baby is born, this never occurred and Louis's mother took the prints herself the next day. The staff made no effort to help Louis clean up before leaving, nor was she given a feminine napkin for her ride home.

Louis testified that this event caused her great mental anguish beyond the miscarriage itself. She felt humiliated, fearful, and worthless, and these feelings led to insomnia. The jury found the hospital negligent and awarded Louis $55,000 in damages. Mercy appeals.

## II.    DISCUSSION

Oklahoma permits recovery of damages for mental anguish if they are "produced by, connected with or the result of physical suffering or injury to the person enduring the mental anguish." *Ellington v. Coca Cola Bottling Co. of Tulsa,* 717 P.2d 109, 110 (Okla.1986) (internal quotation marks omitted). This "does not require the physical

injury to precede the mental anguish." *Id.* at 111. Rather "the rule requires a connection only." *Id.* Thus, "[u]pon proper proof, the Plaintiff may recover for mental anguish where it is caused by physical suffering *and may also recover for mental anguish which inflicts physical suffering.*" *Id.* (emphasis added).

Mercy argues that because Louis stipulated that she had not suffered any physical injuries as a result of Mercy's negligence, her claim to damages for mental anguish must fail. The stipulation, which was in the pretrial order, stated:

> In keeping with Plaintiff's Complaint and Trial Brief, Plaintiff stipulates that she did not sustain, and thus is not claiming any actual physical damages/injuries to the body and/or sickness or disease resulting therefrom in this case. In light of this stipulation, Defendant agrees the cap for non-economic damages may not apply. See 23 O.S. §61.2(A) and (H)(1) (noneconomic cap applies when there is "bodily injury" which is defined as "actual physical injury to the body or a person and sickness or disease resulting therefrom").

Aplt. App. Vol. II at 291–92. Mercy contends that Louis's stipulation shows that she did not suffer any physical injuries as a result of the hospital's negligence *or as a result of her emotional distress*. That is not an unreasonable reading of some of the language of the stipulation. But read as a whole in the context of this case ("[i]n keeping with [Louis's] Complaint and Trial Brief"), particularly in light of the negligence claim in Louis's complaint, we think the stipulation can only be read as disclaiming any "bodily injury"—"actual physical injury to the body"—as distinguished from physical suffering such as insomnia. The district court, familiar with this context, so viewed the stipulation, saying: "I don't agree with your theory about the stipulation as to physical damages limiting the plaintiff on a negligence claim. She is claiming mental anguish and those sorts of damages from which there are some physical manifestations. Specifically, her

4

loss of sleep, I think, is enough to satisfy the elements of negligence." Aplt. App. Vol. V at 677. Thus, the stipulation says only that Louis did not intend to put on evidence that, for instance, the failure to remove the fetus caused physical harm to her uterus. As the district court said, "I'm not finding a bodily injury. I don't think there's any proof of that. There is proof of the physical effects of a mental injury." Aplt. App. Vol. V at 678. We therefore affirm the court's ruling that Louis did not stipulate away her claim that her emotional distress caused physical injury or suffering.

Mercy next contends that there was insufficient evidence of physical injury caused by its negligence to sustain the jury's verdict. In particular, it argues that expert testimony was necessary to prove which damages were caused by "emotional distress *over and above the distress she naturally suffered from the miscarriage*." Aplt. Br. at 26. We are not persuaded. Under Oklahoma law,

> [W]here an injury is of such character as to require skilled and professional men to determine the cause and extent thereof, the question is one of science and must necessarily be determined by the testimony of skilled and professional persons, and cannot be determined by the testimony of unskilled witnesses having no scientific knowledge of such injuries.

*Cushing Coca-Cola Bottling Co. v. Francis*, 245 P.2d 84, 85 (Okla. 1952). But Mercy concedes that expert testimony may not be required to prove the cause of insomnia. And we think Louis's testimony sufficed to prove her emotional injury and that it arose from her treatment at the hospital rather than from the miscarriage itself.

## III.    CONCLUSION

The judgment below is AFFIRMED.

Entered for the Court


Harris L Hartz
Circuit Judge

6